UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT KARLIK,

       Plaintiff,

                                                                    Case No. 12-cv-14879
vs.                                                     HON. GERSHWIN A. DRAIN

CAROLYN W. COLVIN, ACTING
COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

       Defendant.
_____/

**OPINION AND ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#24] AND DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT[#25]**

**I.    INTRODUCTION**

On November 1, 2012, Robert Karlik ("Plaintiff") filed the instant action against his former employer, the Social Security Administration ("Defendant"), raising claims under the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq*. Plaintiff asserts he has suffered his entire life from the learning and cognitive disabilities of dyslexia and Attention Deficit Hyperactivity Disorder ("ADHD"). Plaintiff held the position of Claims Representative Journeyman, GS11, when Defendant terminated his employment in November of 2008. Plaintiff maintains that he is a qualified individual with a disability, Defendant failed to reasonably accommodate him, and terminated him based on his disabilities in violation of the law.

Presently before the Court are the following motions: Defendant's Motion for Summary Judgment, filed on December 20, 2013, and Plaintiff's Motion for Partial Summary Judgment, also

filed on December 20, 2013. A hearing was held on the parties' present motions on March 5, 2014. At the hearing, the Court ordered the parties to supplement their briefing with employment discrimination cases specifically containing the diagnoses of dyslexia, ADHD, depression and low self esteem. The parties submitted supplemental memoranda on March 7, 2014. Upon consideration of the parties' briefing and oral arguments, the Court concludes that triable questions of material fact remain, therefore the Court will deny both parties' present motions.

## II.     FACTUAL BACKGROUND

Plaintiff began working for Defendant on July 13, 2003, as a Claims Representative Trainee in its Owosso, Michigan, field office. Kathie Young was Plaintiff's first-line supervisor, and she supervised him from 2003 through October of 2005. In July of 2005, with Young's approval, Plaintiff was promoted from a GS7 to a GS9 Claims Representative Trainee. In October of 2005, Jackie Hanson succeeded Young as Plaintiff's first-line supervisor in the Owosso office. From October of 2005 through December of 2006, Plaintiff received high productivity scores, however Plaintiff admits that Hanson confronted him about his workloads.

Plaintiff was eventually promoted to a Claims Representative Journeyman, GS11. Defendant describes the Claims Representative position as a "keystone position" with the major objective of "bringing direct personal service to the public." Journeymen Claims Representatives must be able to inform the public about Defendant's benefit programs and extend such benefits to them without the benefit of supervisory consultation in all but the most unusual cases. The position requires ongoing training and can take years to successfully master according to Young, a 30 year veteran employee, with 21 years of managerial experience of agency offices throughout the Midwest.

Hanson became ill and passed away and Romania became Plaintiff's first-line supervisor.

Romania immediately identified the same performance issues supposedly identified by Hanson. Romania noticed that Plaintiff could not remember instructions from one day to the next. He also required a lot of assistance from his coworkers, frequently made errors in his work, and could not complete his assignments on time.

Romania issued Plaintiff a performance assessment that stressed his need to complete work "more quickly," to try to solve his problems "through use of Policynet or other guides before going to a coworker or management for assistance," "to become more proficient in all areas of SSI processing so that you only seek guidance on unusual and highly technical situations," and "to become more proficient in processing redeterminations, limited issues, overpayments and offsets so that you only need guidance with unusual or highly complex cases." Romania also commented on the severity of Plaintiff's work backlog. Tasked with scoring Plaintiff's performance, Romania gave him the lowest grade permissible for an employee who has not yet been placed on a formal improvement plan.

While Defendant maintains that Romania intended to put Plaintiff on a formal Performance Assistance Plan ("PAP"), but was transferred prior to doing so, Romania never discussed her purported intent to place Plaintiff on a PAP with Young, even though Young testified that she and Romania "discussed every employee because [Romania] was a supervisor." Moreover, Young indicated that she would have remembered if Romania had suggested a PAP for Plaintiff since "that would have been a pretty serious discussion when we come to that. When it comes to that then we pull in the higher management . . . . Not to my knowledge did she ever bring that up to me."

Romania left the Owosso office, and Young returned to manage the office from January of 2007 through July of 2007. Young testified that when she returned to the Owosso office, "we were doing some training [] with [Plaintiff] but I didn't have any great concerns." Young described the

Owosso office as consisting of a "great staff" which included the Plaintiff during her six month tenure in 2007.[1]  She thought that Plaintiff "worked really well with people" because he empathizes with them, presumably during interviews.

When Young left Owosso in July of 2007, Jill Behrens became Plaintiff's first-line supervisor.  Within one month, Behrens noticed a problem with Plaintiff's performance and communicated her observation to her supervisor, Fred Bourjaily, Defendant's District I Manager.  Behrens informed Plaintiff of his performance problems in October of 2007; she told him that he was "dragging the office down."  Behrens thereafter banned Plaintiff from speaking with his coworkers in order to ask questions on claims with which he needed help.  She also conducted an audit which revealed that 14 out of 15 cases assigned to Plaintiff had errors.

In March of 2008, Behrens initiated a formal 30-day PAP and later extended it to 45 days.  Plaintiff's PAP detailed Plaintiff's performance failures in three areas: Participation, Demonstrates Job Knowledge, and Achieves Business Results.  During Plaintiff's PAP, he met weekly with Behrens to summarize his performance, address his training concerns, and make sure that he understood his progress.  Behrens memorialized these meetings in weekly progress reports. Plaintiff claims that during his PAP, Behrens belittled him about his performance in front of his coworkers.

While Plaintiff received excellent scores on his PAP examinations and a review of his cases on May 7, 2008 found no errors, Behrens determined in May of 2008 that Plaintiff failed to improve his performance in the three critical areas of Participation, Demonstrates Job Knowledge, and Achieves Business Results.

---

[1] The Court notes that Young submitted a January 10, 2014 affidavit wherein she states that during these six months, she observed that "Mr. Karlik's performance, like that of some other employees I have known at the agency, fell short of meeting the agency's expectations for journeyman level CRS."  *See* Dkt. 30, Ex. A.

Following Plaintiff's unsuccessful PAP, Behrens placed him on a 120-day Opportunity to Perform Successfully ("OPS") plan in May of 2008. The OPS indicated that while Plaintiff seemed to be able to learn new information, demonstrated by his good marks on open-book training tests, he could not "apply . . . the information that he learned during training class to actual cases."

During Plaintiff's OPS plan, Behrens supervised a 175-case audit of his work. Romania, D.J. Hrcka, Plaintiff's union representative, and Debbie Starkey conducted the audit. The results of the audit revealed that at least 123 of the cases processed by Plaintiff contained documentation errors, payment errors or both. When Plaintiff's OPS plan ended in October of 2008, Behrens summarized his performance in writing, concluding that he once again failed to improve his performance in the three critical areas of Participation, Demonstrates Job Knowledge and Achieves Business Results.

D.J. Hrcka believes Plaintiff's inability to communicate with his coworkers accounted for a "large degree" of the errors that "would be made by anybody else [without such] assistance." *See* Dkt. 25-1, Ex. 10 at 353-56. Young testified that preventing a Claims Representative from communicating with coworkers would be "isolat[ing;]" "[t]he complexity of our work is probably like [counsel] talking to another attorney about something. I have this strange case, have you ever come across it. I would think that [it] would be crippling." *Id.* at 116. Young further indicated that the nature of the Claims Representative job required ongoing training and it took up to five years before a representative is "fully functioning." *Id.* at 74.

On August 27, 2008, Plaintiff submitted a SSA SF-501 form requesting an accommodation with an accompanying twenty-two page medical report from Dr. Robert Smith, who diagnosed Plaintiff with dyslexia, ADHD and Adjustment Disorder with Mixed Depression and Anxiety Symptoms. Dr. Smith explained that these disorders substantially limited Plaintiff's ability in reading, writing and concentration. As an accommodation for his disability, Plaintiff requested: (a)

-5-

complete relief from Title II work; (b) removal of the temporary restriction on which employees could assist him with his work; (c) cancellation of his OPS plan; (d) software subscription aids; (e) implementation of all other recommendations found in Dr. Smith's report; (f) funding from the Michigan Vocational Rehabilitation Services to pay for the implementation of Dr. Smith's recommendations; and (g) the cooperative implementation of any additional accommodations, as needed.

Defendant responded on September 23, 2008, requesting that Plaintiff provide additional information such as whether he could read newspapers, government forms, and street signs; what assistance he received in high school and college; and how he lives alone, stays organized, and remembers things. Plaintiff failed to respond to the medical reviewer's inquiry, rather the union, acting on Plaintiff's behalf, informed Defendant that all necessary medical information had been supplied. On October 10, 2008, prior to responding to Plaintiff's request for an accommodation, Behrens issued a proposal to terminate Plaintiff's employment for unacceptable performance. Bourjaily reviewed Behrens's proposal and agreed with her recommendation.

On October 17, 2008, Defendant denied Plaintiff's request for an accommodation, with notice that Plaintiff could seek reconsideration of the agency's decision. There is a factual dispute as to whether Plaintiff requested reconsideration.

Plaintiff timely invoked and fully exhausted his administrative remedies applicable to this action. The Equal Employment Opportunity Commission issued him a right-to-sue letter on or about September 27, 2012.

### III. LAW & ANALYSIS

#### A. Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment

forthwith "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.,* 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will

not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (citing *Anderson*, 477 U.S. at 252).

### B. Defendant's Motion for Summary Judgment

#### 1. Failure to Accommodate under the Rehabilitation Act

To establish a prima facie case for failure to accommodate a disabled employee, a plaintiff must show that: (1) he has a disability; (2) he is qualified for the position; (3) the employer knew or had reason to know of plaintiff's disability; (4) an accommodation was needed because a causal relationship existed between the plaintiff's disability and his request for accommodation; and (5) the agency did not provide the necessary accommodation. *See DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004). Reasonable accommodations may include:

> making existing facilities used by employees readily accessible to and usable by individuals with disabilities, job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters and other similar accommodations for individuals with disabilities.

*Jakubowksi v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010) (citing 42 U.S.C. § 12111(9)). However, "[a]n accommodation that eliminates an essential function of the job is not reasonable." *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1078 (6th Cir. 1988). "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment, including the existence of a vacant position for which she is qualified." *McBride v. BIC Consumer Prods., Mfg., Co., Inc.*, 583 F.3d 92, 97 (2d Cir. 2009).

The Rehabilitation Act does not require an employee to establish the existence of a vacant

-8-

position without an opportunity to engage in an interactive process with his employer so that the employee can identify reasonable accommodations. *Id.* "[T]he interactive process is mandatory, and both parties have a duty to participate in good faith." *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 871 (6th Cir. 2007). It "requires communication and good-faith exploration of possible accommodations." *Id.* When a party obstructs the process, the Court "should attempt to isolate the cause of the breakdown and then assign responsibility." *Id.* "An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the Plaintiff." *Jakubowski*, 627 F.3d at 203.

Once a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated because the accommodation imposes an undue hardship. *DiCarlo*, 358 F.3d at 419. "Undue hardship' . . . requires a detailed showing that the proposed accommodation would 'requir[e] significant difficulty or expense' in light of specific enumerated statutory factors." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 121-22 (2d Cir. 2004).

With respect to Plaintiff's failure to accommodate claim, Defendant does not deny that Plaintiff has a disability. The Court agrees that Plaintiff's diagnoses render him disabled within the meaning of the Rehabilitation Act. Plaintiff suffers from extreme dyslexia and ADHD, among other mental impairments. A disability is defined as: (1) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (2) a record of such an impairment; or (3) being regarded as having such an impairment. *See* 29 C.F.R. § 1630.2(g). A mental impairment has been defined, in part, as "[a]ny mental or psychological . . . and specific learning disabilities . . . ." 29 C.F.R. § 1630.2(h)(2). To be substantially limited, an employee must be either unable "to perform a major life activity as compared to most people in the general

population." 29 C.F.R. §1630.2(j)(1)(ii). Major life activities include, but are not limited to, "learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2)(A).

Here, Plaintiff has mental impairments, specifically dyslexia and ADHD, which substantially limit the major life activities of reading, learning, and concentrating. *See* Dkt. No. 25-4 at 2. Therefore, Plaintiff has a disability within the meaning of the Rehabilitation Act. *See Meekison v. Voinovich*, 17 F. Supp. 2d 725, 731-32 (S.D. Ohio 1998), *rev'd in part on other grounds*, 67 F. App'x 900 (6th Cir. 2003) (finding that dyslexia is a disability within the meaning of the ADA);[2] *Slick v. Onsted. Cmty. Schs.*, No. 07-13727, 2009 WL 3185516, *8 (E.D. Mich. Sept. 20, 2009), *report rejected in part on other grounds,* 2009 WL 3185515 (E.D. Mich. Sept. 30, 2009) (same); *Shaywitz v. Am. Bd. of Psychiatry & Neurology*, 675 F. Supp.2d 376, 389 (S.D.N.Y. 2009) ("Dyslexia, a learning disability, clearly falls under the rubric of disability as that term is defined by the ADA."); *Ugactz v. United Parcel Serv.*, No. 10-cv-1247, 2013 WL 1232355, *7-8 (E.D.N.Y. Mar. 26, 2013) (finding that ADHD and major depression qualify as mental impairments which substantially limit the major life activities of thinking, concentrating, and sleeping).

Moreover, it is undisputed that Defendant knew, or should have known, that Plaintiff was disabled. An employer knows an employee has a disability for the purposes of anti-discrimination law "when the employee tells the employer about the condition, or when the employer otherwise becomes aware of the condition, such as through a third party or by observation. The employer need

---

[2] Claims brought pursuant to the Rehabilitation Act are analyzed in essentially the same way as claims under the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq. See Thompson v. Williamson County*, 219 F.3d 555, 557 n. 3 (6th Cir. 2000) ("Because the ADA sets forth the same remedies, procedures, and rights as the Rehabilitation Act, claims brought under both statutes may be analyzed together.") (internal citation omitted).

only know the underlying facts, not the legal significance of those facts." *Schimdt v. Safeway, Inc.*, 864 F. Supp. 991, 997 (D. Or. 1994). Here, Plaintiff submitted an SSA SF-501 form requesting accommodations and a twenty-two page medical report from Dr. Smith detailing his severe dyslexia and ADHD and how these conditions substantially limited his ability in reading, memory and concentration.

Despite Plaintiff's disability and Defendant's knowledge thereof, Defendant argues that Plaintiff's prima facie case fails because Plaintiff cannot demonstrate he is qualified for his position, with our without reasonable accommodation. While the Court agrees that Plaintiff cannot rely on the fact that he interviewed well enough to be hired by Defendant and successfully performed his job as a trainee Claims Representative to support his contention that he is qualified for his journeyman position,[3] the Court finds that he has nonetheless presented sufficient evidence to show there are questions of material fact concerning whether he could perform his position with reasonable accommodations.

As to Plaintiff's performance as a Claims Representative Journeyman, Young testified that she had no "great concerns" about his performance during her oversight of the Owosso office during a six month period in 2007, the year prior to Plaintiff's termination. Moreover, Plaintiff had high scores during his PAP examinations. While Defendant maintains that these scores are irrelevant because he could not apply his knowledge on the job, such an argument is disingenuous considering this Court's conclusion that Defendant appears to have failed to act in good faith during the interactive process, nor did Defendant provide *any* accommodations to Plaintiff even though

---

[3] *See McGregor v. Louisiana State Univ. Bd. of Sup'rs.*, 3 F.3d 850, 858-59 (5th Cir. 1993) (affirming summary judgment that disabled college graduate, who gained acceptance to law school, was not otherwise qualified to remain in law school).

-11-

Plaintiff proposed numerous reasonable accommodations. Lastly, Dr. Smith opined that Plaintiff's "general intelligence is unimpaired . . he should be able to successfully perform his job duties with the benefit of accommodations and modifications of his work environment." *See* Dkt. 25-4 at 18.

The Court rejects Defendant's argument that Plaintiff requested unreasonable accommodations. Plaintiff's burden of articulating a reasonable accommodation need not be onerous. *See Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 781 (6th Cir. 1998). "For the purposes of a prima facie showing, the plaintiff must merely 'suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.'" *Id.* Plaintiff included numerous proposed reasonable accommodations such as providing audio text books, helping to ensure an environment with minimal distractions, and removal of the prohibition against communicating with coworkers for assistance. Defendant implemented none of these proposed accommodations, including removal of the restriction on communicating with coworkers, even though Hrcka believed that a large number of Plaintiff's errors were attributable to his inability to ask his coworkers for assistance when questions arose.

Additionally, Young testified that Plaintiff's job could be restructured to highlight his good interviewing skills or he could have been transferred to a service representative position, neither of which would negatively impact the production output of the office. While Defendant maintains that there are no available service representative positions at the Owosso office, Young testified that restructuring of, and reassignments to a different position were permissible and within the discretion of the Owosso office manager. Instead of determining whether restructuring Plaintiff's position or transferring him to a different position were reasonable accommodations, Behrens decided to terminate him. *See Ugactz*, 2013 WL 1232355, at *12-13 (denying summary judgment to employer

where plaintiff with ADHD and depression demonstrated the employer failed to offer him an available position and terminated him).

Lastly, the Court cannot conclude as a matter of law that the breakdown in communication during the interactive process was solely attributable to the Plaintiff. Defendant's inquiries do not suggest it was acting in good faith to ascertain whether it could reasonably accommodate Plaintiff's disabilities of dyslexia and ADHD. Reading newspapers and street signs are unnecessary for the performance of a Claims Representative Journeyman's duties. Plaintiff's ability to live alone has no bearing on what accommodations would be necessary in the workplace. Defendant's request for follow up information does not suggest it was legitimately trying to determine the feasibility of Plaintiff's proposed accommodations.

While Plaintiff's responsive letters, sent by the union on Plaintiff's behalf, may have been harshly worded and may be construed as a disengagement from the process, Defendant has not sufficiently shown it acted in good faith under the circumstances. "An employer has sufficiently acted in good faith when it readily meets with the employee, discusses any reasonable accommodations, and suggests other possible positions for the Plaintiff." *Jakubowski*, 627 F.3d at 203; *see also Kleiber*, 485 F.3d at 871-72 (concluding that the employee failed to demonstrate employer's bad faith during the interactive process because the employee admitted personnel acted "very professional," as well as visited the production line to identify other jobs the employee could perform). Contrary to Defendant's contention, the record tends to show that Defendant summarily denied Plaintiff's requested accommodations without conducting an "individualized assessment" of Plaintiff's disabilities, their resulting impairments and whether Defendant could offer reasonable accommodations. Defendant did not conduct an interview of Plaintiff nor study the Owosso office's needs to determine whether restructuring or reassignment would reasonably accommodate Plaintiff's

disabilities. Yet, Young, who worked in the Owosso office for approximately two and a half years, testified that restructuring of the Claims Representative Journeyman job could be accomplished without jeopardizing the Owosso office's productivity.

Defendant is also incorrect in claiming that Plaintiff's proposed accommodations would have posed an undue burden. Defendant has not made a detailed showing that all of Plaintiffs' proposed accommodations would impose undue difficulty or expense, particularly in light of the fact that Defendant could have implemented the accommodation that it offers to all of its non-disabled employees. Namely, the ability to communicate with coworkers when questions arise throughout the workday, in a position that the record shows can take years to learn and requires ongoing training.

As such, based on the foregoing considerations, the Court concludes that a reasonable jury could find that Plaintiff is qualified for his position with accommodations, and Defendant failed to accommodate him by not restructuring his job duties or reassigning him to another position in violation of the Rehabilitation Act. Defendant is not entitled to summary judgment on Plaintiff's failure to accommodate claim.

### 2.     Disability Discrimination under the Rehabilitation Act

To prevail on a disability-based discrimination claim under the Rehabilitation Act, an employee must establish that: (1) he is an individual with a disability; (2) he is otherwise qualified to perform the job requirements, with or without reasonable accommodation; and (3) he suffered an adverse employment action by reason of his handicap. *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007). Plaintiff does not identify direct evidence of disability discrimination, thus the Court must employ the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007).

Under the burden-shifting approach, Plaintiff must first demonstrate a prima facie case of disability discrimination. If plaintiff proves a prima facie case, the burden of persuasion shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas*, 411 U.S. at 802. Once the employer carries this burden, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Id.*; *Ang v. Proctor & Gamble Co.*, 932 F. 2d 540, 548 (6th Cir. 1991). The plaintiff may meet this burden by showing: 1) that the stated reasons had no basis in fact; 2) that the stated reasons were not the actual reasons; or 3) that the stated reasons were insufficient to explain the employer's action. *Wheeler v. McKinley Enters.*, 937 F. 2d 1158, 1162 (6th Cir. 1991).

As discussed in section, III.B, *supra*, Plaintiff suffers from dyslexia and ADHD, thus he is a person with a disability. Moreover, Plaintiff suffered an adverse employment action when Defendant terminated him based on his poor performance evaluations which criticized his reading, memory and concentration skills. *See Manning v. Tacoma Public Sch.*, C06-5078-RBL, 2007 WL 2495138 (W.D. Wash. Aug. 30, 2007) (denying summary judgment on the plaintiff's ADA claim where she suffered from dyslexia and ADHD and questions of fact remained as to whether she could perform the essential functions of her job and whether the defendant's decision to terminate her was partially motivated by her disability); *see also Meekison v. Voinovich*, 17 F. Supp.2d 725 (S.D. Ohio 1998) (concluding that the plaintiff had established a prima facie case by demonstrating her termination was based on her inability to perform the reading and writing tasks of her job due to her dyslexia and her employer failed to provide any reasonable accommodations).

Additionally, this Court has already concluded that Plaintiff has presented evidence for a reasonable jury to conclude that he could perform his job with reasonable accommodations. As

-15-

such, Plaintiff must establish that Defendant's reason for terminating him was pretext for discrimination. Here, Plaintiff has offered evidence upon which a jury could conclude that Defendant's reason for its adverse employment action was "insufficient to warrant the challenged conduct." *Johnson v. Kroger*, 319 F.3d 858, 866 (6th Cir. 2003). Plaintiff has offered evidence that another employee, who is not disabled, in the Owosso office was committing errors at a 66% rate, however this individual was not put on a PAP or OPS plan, nor terminated from employment. Defendant is likewise not entitled to summary judgment on this claim.

### C. Plaintiff's Motion for Partial Summary Judgment

In his present motion, Plaintiff requests that the Court find he is a qualified individual with disability, conclude that Defendant failed to reasonably accommodate him, order Defendant to engage in the interactive process and/or order his reinstatement. Here, the Court has already determined that the Plaintiff has established he has a disability, of which Defendant was aware. He has further shown that he requested a reasonable accommodation associated with his disabilities' impairments and Defendant failed to establish undue burden with respect to all of Plaintiff's proposed accommodations.

However, construing the evidence in the light most favorable to the non-moving party, the Court cannot find as a matter of law that Plaintiff has demonstrated no reasonable jury could conclude he was unqualified for his position with reasonable accommodations. Moreover, it is unknown how the jury may view Plaintiff's conduct during the interactive process. The jury may reasonably conclude that Plaintiff failed to act in good faith with regard to the mandatory interactive process when he refused to answer *any* follow up inquiries. Rather, Plaintiff sent letters in response that Defendant describes as "vitriolic" and may be viewed as obstructionist. As such, partial summary judgment in favor of Plaintiff will also be denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [#24] is DENIED and Plaintiff's Motion for Partial Summary Judgment [#25] is also DENIED.

SO ORDERED.

Dated: March 18, 2014

/s/Gershwin A Drain
GERSHWIN A. DRAIN
UNITED STATES DISTRICT JUDGE